Next in case number 22-2895, Baltas v. Maiga, that out. Mr. Dennard, are you doing this on a pro bono basis? Yes, Your Honor. As part of the pro bono panel? Yes, Your Honor. Well, as a former chair of the pro bono panel of the Second Circuit, and on behalf of this panel, I thank you. Good morning, Your Honors, and may it please the Court. Pro se plaintiff Joe Baltas was subjected to years of threats, violence, and isolation, and rather than allow him the opportunity to argue the merits of his claims, the district court improperly dismissed his claims on initial review and at summary judgment. The record evidence of defendant's conduct and retaliation, at minimum, establishes material disputes of fact that Mr. Baltas should have been permitted to argue at trial. The district court's dismissal of his claims warrant reversal for multiple reasons, and I'd like to focus on three of them. First, the district court improperly disregarded numerous disputes of fact in dismissing Mr. Baltas's retaliatory transfer claim. Second, the district court ignored record evidence establishing that Mr. Baltas was denied due process when defendants failed to conduct meaningful reviews of his administrative segregation status. Third, the district court erred in finding that Mr. Baltas failed to exhaust his administrative remedies under the PLRA. Finally, my client also strongly believes in his claims pursuant to the Interstate Corrections Compact, and I'd like to touch on those as well. With respect to Mr. Baltas's First Amendment retaliatory transfer claim, the district court improperly disregarded the material disputes of fact regarding the retaliatory nature of his transfer to Virginia. Am I right that the evidence pointed in one direction with respect to the causation issue, namely that Virginia had agreed to the transfer and Connecticut, the Connecticut Department of Corrections had also agreed to the transfer even before the relevant protected activity? Your Honor, I think there is a dispute of fact as to the timing of the purported decision to transfer, and Mr. Baltas disputed that fact, including in opposition to his Rule 56 statement. And how did he dispute the fact that there was an agreement between the two prior to his filing? Your Honor, there's simply no evidence in the record other than a self-serving affidavit from him. Every affidavit is self-serving. Trust me, every bit of testimony is self-serving to some degree and at some level. So let's say that we have no reason at this stage to say that it's not accurate. Is there something other than a self-serving affidavit? Well, is there something to rebut the self-serving affidavit? Your Honor, I think the absence of any documentary evidence of the purported decision to transfer is itself relevant here. In addition, there is evidence in the record that Mr. Baltas provided notice to the defendants of his Federal claims in October. So even if we grant the defendants that the decision to transfer him was made before the Federal claim was actually filed, there's evidence in the record that the defendants were on notice of that prior. But even putting that aside — So that would extend and weaken your temporal proximity argument? I'm not — it would extend the time. That's right, Your Honor. I think the timing of the mailing was October 22nd. So it was a matter of a couple of weeks. So I'm not sure it substantially impacts it. And I would further note that this Court has found temporal proximity on timeframes of five and six months, which is far longer than the roughly one or two months at issue here. I'd also note — It just seems — I mean, you have a lot on temporal proximity. And so what you just said, maybe not significantly, but it at least expands the timeframe. But then back to my colleague's original question, it seems to me the logic of the import of temporal proximity is substantially undermined by the notion that the transfer was started prior to the filing of the complaint. Your Honor, the other thing that I would note is that in addition to the Federal claim, Mr. Baltus had at that time pending a habeas petition as well, which could also serve as the basis for finding of temporal proximity here. Temporal proximity is sufficient to find retaliation. Was that an argument made before Judge Shea? It was, Your Honor. It's the Baltus II case that was filed in July of that year. Recognizing that that would also extend the time as to temporal proximity, that was a case that was pending, including in which one of the defendants at issue here was the defendant in that case. While temporal proximity is sufficient here, it's not necessary to reach the issue because the district court also improperly disregarded ample evidence that Mr. Baltus had, evidencing that his transfer was retaliatory, including statements by Connecticut Department of Correction officials during his transfer that he was being transferred in order to interfere with his litigation, as well as emails evidencing a quid pro quo scheme here between Connecticut and Virginia. There's rarely direct evidence of intent on a retaliation claim like this. And here we have an email exactly telling us what was going on between the two states. The district court improperly disregarded that evidence in rendering summary judgment against Mr. Baltus. So I see how that goes to causation and a genuine dispute. But what about the Mount Healthy defense, again, focusing on the import of the undermining of the temporal proximity as a result of the transfer being initiated prior to the complaint? I'm sorry, Your Honor. I didn't follow the question. I think the other issues you've raised go to causation. With respect to the Mount Healthy defense, the fact of the complaint being filed sorry, the transfer being initiated prior to the complaint being filed seems to me an obstacle. Yes, Your Honor. We think that even if Your Honors are not inclined to find on that basis, that the additional evidence would have been sufficient, even putting aside the question of temporal proximity to allow Mr. Baltus to proceed to trial on his claims. Unless Your Honors have questions on that, I'd like to turn to the second issue, which relates to the question of meaningful review of his administrative segregation status. There, the evidence established that defendants did not conduct meaningful review of his process during the more than 18 months in which he was in segregation. There's no dispute here that Connecticut regulations require segregation reviews that occur every 30 days, and that no such reviews were conducted here. Is there a requirement that Connecticut conduct those reviews as opposed to, or in addition to, the Virginia Department of Corrections? Your Honor, I'd first note that under Connecticut regulations, they were required to conduct those reviews, but in any case While he was in Virginia? While he was in Virginia. How are they going to do that? Your Honor, there's evidence that Connecticut was in constant communication with Virginia as to Mr. Baltus' status, that he was in communication with officials from Connecticut. All of that information would be relevant to the determination. How is somebody sitting up in Connecticut going to review conditions of confinement in Virginia? Your Honor, as the They both have phones, but beyond that, how is that supposed to happen? Your Honor, we think because Connecticut retained ultimate jurisdiction over Mr. Baltus throughout his entire detention while he was in Virginia, that they're responsible for conducting those reviews. How are they going to do it? You make that assertion, but it seems to I just don't get what's supposed to happen. What are they supposed to do? Your Honor, we think that it would be incumbent upon Connecticut to undertake whatever steps are necessary to determine the conditions of confinement and whether it's appropriate to maintain a defendant like Mr. Baltus here in segregation for more than 18 months. Why weren't the classification reviews Why were they constitutionally insufficient? Your Honor, in Proctor, this Court established a set of factors that must be considered in totality to determine whether a review is meaningful. Here, there's no evidence in the record as to no documentary evidence in the record as to what was considered in those purported classification reviews. I thought, I don't have my fingertips, but they took into account disciplinary history and security-related matters. It seems to me it's precisely the kind of thing that Proctor requires. Defendant's affidavit on this point states generally as to what's considered during a classification review, but there's no statement in the record, documentary or otherwise, that says here are the factors that we considered for Mr. Baltus during these classification reviews. So general statements as to what may or may not be considered in classification reviews generally is not sufficient here at the summary judgment stage at the least. And do you have, so we're at summary judgment on this one, evidence in the record that would suggest that standard process wasn't followed or that nothing was done? Or what's your evidence? Your Honor, I think first, again, is the absence of any sort of documentation that these reviews occurred. But the affidavits on this point as to what was considered failed to mention the ultimate question that this Court recited in Proctor, which is, does the defendant belong, should the defendant remain in segregation? There's no evidence that that overarching question was considered. But isn't, just to pick up on that, I thought one of the factors was directed at that question, if not in specific terms, then certainly in general terms. Your Honor, I think there's a review of the need for ongoing administrative segregation as a part of the score. I'm not sure that specific question is part of it. I recognize that certain of the factors that defendants contend are considered generally in classification reviews might go to that ultimate question. But there's nothing in the record to establish whether that question was, in fact, considered here. So that's the ultimate point. So let me ask you, and maybe this follows up on Judge Parker's question, but it's a little bit of a different question, and I'll pose a hypothetical. Let's just suppose that the Virginia Department of Corrections system of review is the best in the country. So it's every two days it reviews whether administrative segregation for a particular inmate is justified. And it has a whole panoply of different things that it looks at in making its review, and it's Procter plus plus plus, right? And Connecticut engages in none of that review. Can we consider the fact that Virginia is the best in the country in connection with its review in determining whether there's a genuine dispute of fact? Your Honor, I think Connecticut as the state retaining ultimate jurisdiction, even in that scenario, would be required to conduct meaningful review. Why? Why? I like to think of it, there's no sort of right-line rule that applies here, but I like to think of perhaps a slightly different hypothetical, which is if we assume Mr. Baltus was not housed in Virginia but maybe in a private prison, it certainly wouldn't be appropriate for Connecticut to cede its responsibility to the private prison to undertake review of his status, because Connecticut is the one that retains ultimate jurisdiction. Now, obviously, Virginia is a sovereign. It's a different situation. I recognize that. But there's nothing that permits distinguishing the locus of transfer or the receiving prison in order to determine whether a meaningful review occurred. But maybe this goes to your, I think you call it your fourth argument, the ICC argument. But, you know, there's a pursuant to a contract, or a compact, a receiving jurisdiction, an issuing jurisdiction, and they've sort of made an arrangement that, yes, we have jurisdiction over this inmate. I don't like that term, but we have some measure of responsibility. But ultimately, the receiving jurisdiction is responsible for administering where the pursuant is going to be, discipline, for example, and so on. What's wrong with that picture? Is it a matter of the ICC or is it, you know? Your Honor, I'm not sure anything is necessarily wrong with that setup. But the compact at issue here, as implemented by Connecticut, states that it's Connecticut's responsibility to retain ultimate jurisdiction and that inmates are entitled to receive all legal rights in the receiving state that they would be entitled to in Connecticut. And, again, that's because Connecticut, he's a Connecticut prisoner. So if we're satisfied that the Virginia Department of Corrections just, again, hypothetically, has done everything right with respect to justifying ongoing administrative segregation, your view is that that's still a violation of his rights, his due process rights? Your Honor, I think it would remain Connecticut's responsibility to conduct reviews. Is there anything that tells us that? Or is this blue sky, so to speak? Is this an open area? I'm not sure that there's a case directly on point for this issue. But in the hypothetical that your Honor posed, I think Connecticut could easily satisfy its obligations here by taking a look at the Proctor plus, plus, plus process that Virginia has and saying, okay, looks good. Well, isn't there on this record, and maybe you alluded to this, some evidence, I think I'm rebutted, that Connecticut was in touch with Virginia? And why isn't that enough? Because there's no evidence that Connecticut undertook that particular analysis. There's evidence that they were in contact, but there's no evidence that they were in contact for Virginia saying, for example, hey, we looked at these ten factors, we determined that he continues to belong in segregation, and therefore we're going to keep him there. I recognize that I'm far over time. No, this is actually, you're answering questions, so that's very helpful. When you stop answering questions then, it's a lot less helpful. I understand, Your Honor. So I'll ask, what's your third argument? The third argument relates to the district court's finding that Mr. Baltus failed to exhaust his administrative remedies under the PLRA, which was also an error. The operative regulations in Connecticut require transferred inmates to exhaust remedies of both the state in which they're housed, so in this case, Virginia, and also of Connecticut. There's no dispute, and the district court correctly found, that Mr. Baltus properly exhausted his remedies in Connecticut. Mr. Baltus also offered sufficient evidence that his administrative remedies in Virginia were unavailable to him due to the threats and violence that he faced from Department of Corrections officials. The district court, again, rejected this evidence as purportedly too speculative. For example, the district court disregarded Mr. Baltus' testimony that DOC officials threatened him not to file further grievances and directed violence against him because the district court said that that testimony allegedly did not identify names and dates on which the threat occurs. But Mr. Jefferson's declaration affidavit didn't. That's exactly right, Your Honor. He submitted an affidavit, and this is at Joint Appendix 592-594, and this is Mr. Thompson, I believe, is who you're referring to. Yes. Jesse Thompson. That's right. Specifically identified names, dates that all of these things occurred, and the district court simply gave no weight to that evidence and instead found the opposite, that there was nothing in the record that would support Mr. Baltus' testimony and found it speculative. I'm sorry. So the district court actually mentioned Mr. Thompson's affidavit and said what? It didn't make a specific finding with respect to Mr. Thompson's affidavit but gave a general overview and concluded that Mr. Baltus' testimony was too speculative and conclusory. Well, no. So you're mentioning Mr. Baltus' testimony. I'm asking, was there a reference? Did the district court acknowledge or grapple with Mr. Thompson's affidavit? I don't recall specifically whether the district court mentioned it, and I apologize, Your Honor, I was perhaps wording it a little vaguely. The district court concluded that Mr. Baltus' arguments in general were not supported by dates and names in order to support his claim that the process was unavailable. The record, as I read it, reflects that your client was, I mean I've seen a lot of these things, but was an unusually obstreperous, dangerous, violent inmate who everywhere he went was a threat to institutional safety and security. Does that have any constitutional significance? With respect to exhaustion of his administrative remedies, I don't think it does, Your Honor. You can have an inmate who hypothetically has done a number of bad things, right, and they still are entitled to exhaust the process as it set out, and here Mr. Baltus simply wasn't permitted to do so. And as a result, he was then unable to file grievances in Virginia, and then the district court dismissed his claims by finding that he hadn't exhausted his remedies. Thank you. That's very helpful. And so on summary judgment, the district court, we think, improperly found that the claims were too speculative and conclusory and that the record amply supports Mr. Baltus' arguments. Thank you. Thank you, Your Honor. Thank you. Thank you. Good morning. Good morning. Good morning, Your Honors, and may it please the court. Assistant Attorney General Dennis Mancini for the appellees, David Miga, Roland Cook, Angel Quiros, Jacqueline Osden, and Jessica Sandlin. Your Honor, before this court is an individual who has historically been a, one of the most dangerous and most litigious inmates in the state of Connecticut. He has a long history of, well, I should say that he is serving effectively a life sentence, and as a result of that has no incentive to follow anyone's rules, and that includes the court rules. So we are here because there are serious constitutional claims, and the constitutional claims apply to him and to everyone. Absolutely. And so would you just address those claims? I will, and I bring that background because it has to do with the transfer issues and also goes to the exhaustion issues, and I'll address that. I'll address both of those. With respect to the retaliatory transfer, well, with respect to the retaliatory transfer, there was no retaliatory transfer. He was transferred because of his long history of abuses in the Department of Correction, and because of the number of incidents that he had and the difficulty with housing him in Connecticut. What about the seeming background pattern? He's transferred from Connecticut to Massachusetts, and then immediately the state argues that that moots the prior claim, and then as soon as that's dismissed, he's been transferred back to Connecticut. And then he's transferred from Connecticut to Virginia, and the same pattern follows. So that's actually not the way that it happened. He was transferred to Massachusetts. There was an argument about dismissing the habeas that was here. Well, I guess even taking a step back from that, all these individuals are individual capacity defendants. So the habeas was nominally with regards to Roland Cook, but that was only in his official capacity as a commissioner of correction. So these are all individual capacity defendants, not necessarily associated with those claims. No, I understand it's not what's at issue, but as background. No, understood. Understood. And when he went to Massachusetts, the case was dismissed because he was no longer in administrative segregation. That was his claim on the habeas. So that's what happened there. And he didn't make any claims that the transfer to Massachusetts was retaliatory. It was only the transfer to Virginia. When he went to Virginia, the case was raised that he was no longer in Connecticut, but that's not why Baltus II was dismissed. Baltus II went to trial and was dismissed because of his conduct before the court. And I did address that in my appendix, the comments that he made. And, again, that goes to his unwillingness to follow the rules and to follow the decorum of the court. Once that case went to the point where he didn't feel like he was going to get what he wanted from the judge, he lashed out at that judge. He also lashed out at a judge in Massachusetts with a letter that he sent to that judge following his return to Connecticut. And that's also in the record that I provided, that letter that he sent to Massachusetts while he was in Northern. So all of these go to the fact that these transfers were not retaliatory, that the evidence does not demonstrate that these were retaliatory. The history goes in regards to temporal proximity. The first request to transfer him out of state came in 2016 with the warden in Garner. That request was not completed at that time. The request again was raised to transfer him because of the issues that persisted. He went to Massachusetts. He came back to Connecticut. While he was in Connecticut, he assaulted a correctional officer. He disputes that. He says that he was defending himself. But regardless, as a result of that, he stayed in Connecticut. But as soon as the end, there's e-mails that show that from, it's attached to the declaration of attorney, from Defendant Miga. There's e-mails from Defendant Sandler to Defendant Miga that say he's in Connecticut. We're going to keep him in Connecticut. Let's start to look for someplace else to transfer him to. Is that okay? And I believe that the response from that was September 19th or 20th, somewhere around the end of September, was already the discussion of trying to find another state to transfer him. The allegation that the desire to transfer him to Virginia as some sort of punishment because Virginia was this terrible place also isn't worn out by the record. Virginia was the only state that was willing to take him. It was the only state that would be able to accommodate the remote court proceedings. There were some difficulties with remote court proceedings while he was in Massachusetts. So that was one of the concerns that was considered when the determination was sent to Virginia. So the record is clear that the transfer was not retaliatory in any way. Would you address the due process? I will. As the court had already indicated, I think succinctly, the classification hearings that took place in Connecticut had no effect on his classification in Virginia. Although he was in segregation in Virginia for 18 months or whatever the statement was, part of that was his own doing. His classification in Connecticut remained the same. He transferred to Virginia initially. He was in segregation for a period of time while he did his intake, and then he was sent to general population. He was initially in general population until he was assaulted, and then he went to that restricted housing. After that, he had opportunities to transfer out of that facility or to return to general population, and he refused all of those, and that is in the record. Where is that? I could. I'm sorry. He refused to go back to general population? He refused to be transferred to a different facility. There were numerous occasions where he was offered. He refused to sign all of those. Those are all in the record. Does that indicate whether he would be held in segregation in other facilities? I believe that the record reflects that he would not have been held in administrative segregation in other places. Do you have a cite for that? I can find it. If I could just have one moment. Good. If you can't find it quickly, then after your friend's rebuttal, maybe you can just provide us with citation. Just one moment, please. It is a joint appendix. It was attachment used as a joint appendix 304, 305, 306, 307, 308, 309, 310, 311, 312, 313. All right. We get it. We got the picture. Thank you. Around 304 to 313 or 314. Those are all the transfer offers that were made to Mr. Baltus, which he refused. He refused to sign and refused to accept those transfer requests. So part of that was the reason that he remained in administrative segregation for as long as he did. So at least to my mind, there are maybe more than two issues. But the two main issues that you heard, the colloquy with your friend on the other side, one is Connecticut's independent obligation to review. And the other is the classification reviews and whether they satisfy the, as a matter of the scoring, what we have insisted on in Procter. And I'll address that. So the first thing is that there was a lot of emphasis placed on this wasn't meeting Connecticut's or Connecticut administrative requirements. And that's not the constitutional floor. The Connecticut administrative directives do not set constitutional, are not the basis for a constitutional violation. That's the first thing. The other thing is that, as the court noted, it was Virginia's duty to manage him. It wouldn't be appropriate for Connecticut to tell Virginia how to house this inmate. Connecticut does not have the, just like it wouldn't be appropriate for Virginia to tell Connecticut how to house the inmates that are here. No, but I don't think, just to be fair, I think, to the other argument, the counterargument. I think that the contention is that there's got to be, at least on summary judgment, some showing that Connecticut undertook, not telling Virginia what to do, but undertook some form of review itself, separate and apart from whatever it is that Virginia did. Well, I think the record is clear that Connecticut did do its own reviews. All Virginia? I don't believe they did any reviews of Virginia. But, again, Virginia is in the best position to be able to determine how inmates should be housed in Virginia. Connecticut doesn't know what the intricacies of what inmates are dangerous or what inmates are troublesome. So what is the nature of the review that Connecticut undertook? Connecticut, I believe, just reviewed the information that Connecticut had with respect to his. In Connecticut. And Judge Shea noted that even if it was error, it was harmless error because it would not have had any impact on his classification in Virginia. And, again, when Mr. Baltas first arrived in Virginia after his initial intake, he was placed in general population, despite what his status was in Connecticut. And he remained in administrative segregation in Virginia because of his refusal to be transferred. Okay. I am at the end of my time. If I could just address the exhaustion. Well, of course, exhaustion. Yeah, I will address that. I think that the district court correctly assessed that. I know there was some discussion about Mr. Thompson's. Yeah, would you address that? And I will. I'll tell you I have a hard time unless the argument is one that rests on admissibility. I'm having a hard time. There's two things. So first is that Mr. Baltas had his own separate affidavit with respect to exhaustion. So while Mr. Thompson's affidavit was in the record, he didn't specifically cite directly to it as required for. He's proved safe. He is, but he's a very experienced litigant, Your Honor. I think so. But understanding that, he is very experienced. The second thing is that Mr. Thompson's affidavit itself is internally inconsistent. In his type statement, he indicates that inmates in the restrictive housing unit were unable to communicate with each other. They were unable to talk to each other because they were in cells that were. And if I can find the exact part that I'm speaking about. But he says that inmates were in cells that prevented them from communicating with each other. But clearly he's able to communicate with plaintiff Baltas. So that part doesn't really make a lot of sense. There's also the issue that the, which Judge Shea noted that Mr. Baltas had filed a separate lawsuit in Virginia, claiming retaliation and threats by Department of Correction officials down there. And that court also disregarded those claims. And Judge Shea did address that in his brief. Did Judge Shea, you just have to remind me, somebody. Did he specifically mention Mr. Thompson's affidavit? He did not. He did not. No. So he didn't refer to the internal inconsistency. He did not. He did not. But I would like to point it out if I could. Yeah. On 593, so paragraph 14. While in RHEU, I began to speak with Baltas, and then it continues. And then in 24, he talks about the conditions and restrictions experienced in RHEU pod are inclusive of but not limited to. And the third line down, absolutely no social interaction or activities of any kind. And then he says a total of five outside recreation cages enclosed by inch thick plexiglass that makes it impossible to socialize or interact with peers in adjacent cages. So he says that he's not able to communicate with other individuals while he's in RHEU. But clearly, but then previously said that he gets in touch with people. That is terrific fodder for cross-examination at trial. The question is on summary judgment, whether he's said enough or whether this is enough to create or generate a genuine dispute of fact on exhaustion. And there's a reference, you know, to Shea, who's a great judge in my view, says that one basis for rejecting the exhaustion issue and granting summary judgment is that the claims were too conclusory, the argument was too conclusory. And that the facts as related by Mr. Baltus were too conclusory. But you look at, there are no names and so on. You look at Mr. Thompson's affidavit, there are names. There are, you know, specific places. And it talks about a hit soliciting me, me. So a statement against interest for a hit on an inmate. And I think, well, that is, that is, that seems to be material to me. And the fact that just Shea doesn't even mention it makes me wonder, appreciating that it was not necessarily raised by pro se, makes me wonder what are we to do with this? And to the extent that you are relying on internal inconsistency, what we've said is that we only reject an affidavit or testimony when it's unequivocally inconsistent with something else that the person has said. I don't know that this qualifies. So to help me. Again, I think that the court takes, there's already a disbelief in these kind of retaliation claims because they're so easy to fabricate. And I think that's part of it. There's also, although there's discussions about. It may be easy to fabricate. We can talk about some of the judgment standards for years. But it's a little unusual to have another inmate. Who submits an affidavit saying, yeah, I was solicited. To for a hit. And then there's actually an assault. He's this inmate is not the one that could. No, I know that. But then there's actually an assault. So. This. Well, I. It's. This statement was made after the date of that assault. So, I mean, I don't know what his motivations were, assuming that these statements are. I don't know. I certainly can't speak to his motivations. Obviously, he would have had it. He would have had information about that assault. I don't know who typed up this affidavit or how it was brought. I know those are not necessarily questions before the court at summary judgment. Understanding that. But these are also general claims. There's not necessarily talking specifically about him filing grievances. They're not saying that if he talks about pushing paper or filing lawsuits. And it also says at 15, while housed in R.H.U. B416 next to Baltus in B415. I repeatedly overheard unit manager Miller and Lieutenant Lambert threaten Baltus and instruct him not to write anything up. That's J.A. 593. That's a threat for filing something. I'm asking these questions because I'm scratching my head. He also has to demonstrate that he was actually in fear. That's also another thing that he has to demonstrate. That his fear was reasonable and that the fear actually prevented him. That's not true. A lieutenant and the unit manager threatening him and instructing him not to write anything up. Aren't we supposed to view this in a light favorable to him? But notwithstanding that, he still has to demonstrate that he was actually in fear based on these statements. Even if somebody had said those things to him, he'd have to demonstrate that he was actually fearful. And the other thing that I do want to address is that the exhaustion issues only dealt with a small subset of the claims. No, I understand that. Yeah. It was only in all those claims. And overarching with all these claims is that the Connecticut defendants didn't have any personal involvement in any of the issues that took place in Virginia. So that relates to the exhaustion. I'm sorry. So if we were to disagree with you about or with Judge Shea really about the conclusive nature of the statements and so on, then you're saying there's a separate issue that we need to grapple with which relates to Connecticut's involvement? Judge Shea didn't reach the merits on those claims. He didn't reach the merits on those claims. So we would send It would go back to the district court to make that determination. It would go back to the district court. And that's a first. There's a Sixth Amendment claim, an Eighth Amendment claim. The Virginia claims, the ones that were related to the exhaustion were a First and Sixth Amendment claim arising from implementation of Virginia's DOC procedures and an Eighth Amendment claim related to his safety concerns while housed at the Red Onion State Prison. Those are the two claims. The other claims made it Is the Sixth Amendment claim under that? There's a Sixth Amendment claim, yes. So it's the First Amendment. He's got a mail claim. The mail claim was addressed. Yes, the mail claim, yes. So First Amendment mail claim, Sixth Amendment claim, Eighth Amendment claim has the exhaustion. Those were the ones that Judge Shea didn't reach the merits because he got to exhaustion. Right. And those were all claims related to his confinement in Virginia, which, again, we raised the issue at summary judgment that there was no personal involvement, but Judge Shea didn't reach that. He didn't reach that because he disposed of those claims on exhaustion. Okay. So we would still say that there was no personal involvement. They would be entitled to qualified immunity on those claims, but Judge Shea did not reach that. Okay. That's an overarching issue that there was no personal involvement from the Connecticut defense on most of these claims. And at this point, I'm out of time unless the Court has any additional issues. Thank you, sir. Thank you very much. Thank you. I think defendants' arguments, both in the briefing and today, underscore exactly the issue here, which Your Honor correctly noted, which is we're at summary judgment here. There are numerous disputes of fact. The defendants repeatedly dispute the facts, as Mr. Baltus asserted them. But on summary judgment, we have to credit his arguments. And the district court simply failed to do that. I want to touch just briefly on each of the claims. First, with respect to retaliation and temporal proximity, I just want to lay out the timeline just because I know it's a little bit confusing here. Defendants contend that a decision to transfer him was made in early November. Mr. Baltus disputes that. But even if we assume that's right, prior to that, roughly three weeks prior to that, and this is at JA-473, Mr. Baltus provided notice of his Federal plan. So we're talking a three-week period from the decision to transfer if we're contending that that's the relevant date. And in addition, he had a habeas claim that was pending for approximately five months prior to that. With respect to the self-serving affidavits, I recognize Your Honor acknowledged that affidavits are always self-serving. But the jury was entitled to discredit those self-serving affidavits, as this Court found in IV services. And that case is cited in our briefing. Third, the jury is entitled to consider- So, and I mentioned this to your friend. So, and we could have this discussion about summary judgment, but there are going to be self-serving affidavits. But if they are unrebutted on the record, then that is a basis to grant summary judgment. And so, regardless of what a jury could do. And I don't know that I saw any evidence that rebutted that affidavit. Your Honor, I think there's substantial additional evidence, including, for example, the statements that were directly made to Mr. Baltus, the quid pro quo email, which is at Joint Appendix 577.02, as well as Mr. Thompson's affidavit, which stated that one of the assaults against Mr. Baltus was for him being, quote, a rat. So, I think all of that evidence would go to this question. With respect to administrative segregation, there was a defendant brought up that Mr. Baltus was given the opportunity to be transferred elsewhere, which he denied. And he pointed to Joint Appendix approximately 304 to 314. Nothing in those transfer offers indicate that Mr. Baltus would not be placed on administrative segregation wherever he was transferred. So, I'm not sure that that helps defendants here establish that they conducted meaningful review. With respect to defendants' arguments that a violation of Connecticut's regulations are not a basis for a constitutional violation, I think that's not quite the argument here. Rather, and this is consistent with the Court's findings in Tellier, the failure to follow Connecticut regulations is evidence of a lack of a meaningful process. It's not, in and of itself, the constitutional violation. Thank you. Thank you, Your Honor. Thank you very much. Full result decision. Thank you both.